*Confidential*
*9/16/2005*

# TERM SHEET
*(for discussion purposes only)*

---

Reference is made to our recent discussions relating to the organization and funding of a new entity (the "Company") to engage in the research, development and commercialization of intellectual property relating to Helminths (the "Technology"), which is exclusively licensed by OvaMed, Inc. ("OvaMed") from the University of Iowa upon the following terms and conditions:

    1.    Paramount BioSciences, LLC ("Paramount") shall cause the incorporation of the Company for the initial purpose of licensing the Technology.

    2.    Ovamed and the Company shall enter into a definitive license agreement (the "License Agreement") pursuant to which Ovamed shall grant to the Company an exclusive, worldwide (with the exception of Inflammatory Bowel Disease in Europe) license (including the right to grant sublicenses) to use the Technology and all know-how related to the Technology, as well as to all patents, patent applications, continuations, continuations in part, divisionals, reissues, reexaminations, and improvements relating the Technology to use, make, have made, lease, have sold or sell the products incorporating the Technology and know-how except the manufacture of the product (each a "Licensed Product," together, "Licensed Products").

    3.    During the term of the License Agreement, the Company shall pay to Ovamed royalties equal to (i) four percent (4%) on NET SALES of LICENSED PRODUCTS to END USERS sold by Licensee, its AFFILIATES, distributors, sublicensees, or any party under any agreement with OvaMed for marketing or distribution rights.

"Net Sales" shall mean the total gross receipts for sales of Technology by or on behalf of the Company or any of its Affiliates or sublicensees, whether invoiced or not, less only the sum of the following: (a) usual trade discounts to customers; (b) sales, tariff duties or use taxes directly imposed and with reference to particular sales; (c) outbound transportation prepaid or allowed and transportation insurance; (d) amounts allowed or credited on returns; (e) bad debt deductions actually written off during the accounting period; (f) sales commissions; and (g) packaging and freight charges.

    4.    The Company shall make the following onetime milestone payments to Ovamed during the Term of the License Agreement:

    (a)    Non-refundable license fee of $110,000 due upon execution of the License Agreement;
    (b)    100 % of Patent Cost reimbursement as invoiced by UIRF for patent applications outside the European Union and 70 % of EU Patent Costs
    (c)    $1,500,000 upon acceptance by the FDA of a Company sponsored Investigational New Drug Application (an "IND") for a Licensed Product.

*Confidential*
*9/16/2005*

(d) $1,500,000 upon the one year anniversary of the Option Date (as extended);

(e) $ 200.000 upon the completion of a financing by the company of at least $ 5,000,000 through the sale of its equity securities

(f) 1st NDA application in U.S. sponsored by Company, Sublicensee or Affiliate - $600,000

(g) $1,750,000 upon the final approval by the FDA of the first Company sponsored (or sublicensee sponsored) NDA for a Licensed Product;

(h) Subsequent sponsored NDA approvals for each additional indication - $1,250,000

(i) Acceptance for review of the first sponsored application for the commercial sale of a LICENSED PRODUCT in the European Union by the European Agency for Evaluation of Medicinal Products (the "EMEA") or its successor organization - $200,000

(j) Final approval by the EMEA or its equivalent of the first application for the commercial sale of a LICENSED PRODUCT in the European Union - $400,000

(k) Final approval by the EMEA or its equivalent for the commercial sale of a LICENSED PRODUCT for each subsequent indication in the European Union - $400,000

(l) Acceptance for review of the first sponsored application for the commercial sale of a LICENSED PRODUCT in Japan by the Ministry of Health, Labor, and Welfare or its equivalent - $200,000

(m) Approval of a sponsored application for the commercial sale of a LICENSED PRODUCT in Japan by the Ministry of Health, Labor, and Welfare or its equivalent - $400,000

(n) Approval of each additional indication in Japan by the Ministry of Health, Labor, and Welfare or its equivalent - $400,000

(o) Acceptance for review of the first sponsored application for the commercial sale of a LICENSED PRODUCT in Canada by Health Canada or its equivalent - $200,000

(p) Approval of a sponsored application for the commercial sale of a LICENSED PRODUCT by Health Canada or its equivalent - $400,000

(q) Approval of each additional indication in Canada by Health Canada or its equivalent - $350,000

(r) Acceptance for review of the first sponsored application for the commercial sale of a LICENSED PRODUCT in Australia by the Pharmaceutical Benefits Advisory Committee - $150,000

(s) Approval of a sponsored application for the commercial sale of a LICENSED PRODUCT in Australia by the Pharmaceutical Benefits Advisory Committee or its equivalent - $350,000

(t) Approval of each additional indication in Australia by the Pharmaceutical Benefits Advisory Committee or its equivalent - $350,000

"Indication" shall be defined in the License Agreement, but shall essentially mean a disease or syndrome in which there is a recognized commercial market for products to treat such disease or syndrome.

5. Company agrees to provide Licensor thirty percent (30%) of any Non-Royalty Sublicensing Income received by Company as a result of the sublicensing of any Licensed Product ("NRSI" as further defined below) prior to the pre IND meeting; fifteen (15%) of NRSI subsequent to the pre-IND but prior to commencement of clinical trials in the United States; seven and one half percent (7.5%) of NRSI after commencement of the United States clinical trials but prior to the completion of enrollment of a phase II clinical trial in the United States; and one (1%) of any NRSI subsequent to receiving authorization from the FDA to commence a phase III clinical trial in the United States but prior to the filing an NDA. NRSI means any fees, payments, or monies received by Company directly related to the sublicensing by the Company of rights to commercialize Licensed Products or Licensed Processes, excluding (a) payments received from the sale or issuance of debt or equity securities of the Company; (b) payments received by the Company that are specifically designated in any agreement with a third party to be dedicated to the research and development of the Technology or dedicated to establish a marketing and sales force for sales of Licensed Products; and (c) payments resulting from the sale of one or more Licensed Products, including royalties.

6. The License Agreement shall state that the Company shall use reasonable commercial efforts to bring Licensed Products to market through a thorough, vigorous and diligent program for exploitation of the Specified Technology as timely and efficiently as possible. Such program shall include the preclinical and clinical development of the project, including research and development, manufacturing, laboratory and clinical testing and marketing of Licensed Products. The Company shall continue active, diligent marketing efforts for the Specified Technology throughout the term of the license.

7. The license shall terminate on a country-by-country basis upon the expiration of the last to expire licensed patent (or other intellectual property protection stemming from such licensed patent or patent applications) in such country. The Company shall have the right to terminate the License Agreement in any country, on thirty (30) days written notice.

8. The License Agreement will grant the Company the first right to prosecute, defend, and enforce the patent rights relating to the Technology and will contain such other terms and conditions as are customary in the industry if agreed by UIRF. The License Agreement will

*Confidential*
*9/16/2005*

state that the Company will be a third party beneficiary to Ovamed's license agreement with the University of Iowa.

9. The Parties agree to negotiate in good faith a separate Manufacturing and Supply Agreement whereby the Company will purchase from Ovamed, and Ovamed will supply Company, all of its requirements for clinical supplies and finished product. Ovamed will agree to supply the Company with the Licensed Products at a cost of $125 per dose (each a "Dose") for clinical supply and $175 per Dose for commercial supply. OvaMed will also agree to use commercially reasonable efforts to efficiently produce the Licensed Products. The Manufacturing Agreement shall further state that the Unit Price will be commercially reasonable and that OvaMed must ensure to timely supply GMP quality Licensed Products to the Company in commercially reasonable quantities based upon annual estimated forecasts by the company.

10. Commencing on the fourth anniversary of the License Agreement, the Company will remit annual maintenance payment to OvaMed equal to $250,000, such payments to be reduced by the total amount of any milestones, and royalties accrued to solely during the relevant AGREEMENT YEAR but shall not be reduced by (a) any royalties accruing in any other AGREEMENT YEAR or (b) contract research funding payable pursuant to the terms of any Sponsored Research Agreement.

11. Unless otherwise required by law, at no time prior to or following the consummation of Definitive Agreements (defined below) shall either party use the name of the other, or any person or entity affiliated with either party or discuss the terms hereof with any person or entity, without the prior written consent of the other or such person.

12. In consideration of $5,000 and other good and valuable consideration, including extensive due diligence expense of Paramount, OvaMed agrees that, in the absence of the Paramount's prior written consent, it will neither solicit nor accept offers from third parties and shall refrain from any discussions or negotiations with third parties (whether directly or through attorneys, agents, investment bankers or otherwise) with respect to licensing, developing and commercializing the Technology or otherwise conferring any rights or privileges in or to the Technology with any third-parties other than the Company, until the earliest to occur of (a) execution of Definitive Agreements (as defined below), (b) the Company's informing OvaMed that it no longer intends to proceed with the transactions contemplated hereby, or (c) sixty (60) days following the date hereof or such longer period of time so long as the parties hereto are engaged in good-faith negotiations.

13. Each party agrees that this term sheet and the information contained herein shall be treated as confidential and further agrees not to disclose to any party the content or the existence of this term sheet or the negotiations contemplated hereby, except to the extent that such other party is necessary to such negotiations.

14. This Term Sheet shall be governed by the laws of the State of New York, without regard to principals of conflicts of law.

15. The foregoing is only a brief outline of the proposed terms of the License Agreement, which shall be more definitively set forth in the definitive License Agreement and

SEP.19.2005  5:19PM                                                     NO.365   P.2

*Confidential*
*9/16/2005*

related documents (the "Definitive Agreements) and each of the foregoing terms must be interpreted in the form in which they finally appear in the Definitive Agreements. The License Agreement shall be subject to German law. Other than as contemplated by the last sentence of this paragraph, this Term Sheet is for discussion purposes only, does not represent an offer and is not binding on the parties hereto or any other investor and no party will be obligated or bound in any manner (except as provided in this paragraph) unless the Definitive Agreements are executed by authorized representatives of each party hereto. Further, this Term Sheet does not create any obligation on the parties to commence or continue negotiations with the other or to enter into any further agreements. The foregoing terms are subject to the prior legal, financial, patent and technical due diligence investigation by the Company and Paramount to be determined in the Company's and Paramount's sole discretion, which the Company and Paramount shall undertake and seek to complete as quickly as practicable. Each party will be responsible for all of its own costs and expenses relating to discussing this Term Sheet. Only this Paragraph 15, and Paragraphs 11, 12, 13 and 14 shall be legally binding obligations on the parties hereto.

16.  The license agreement between the registered patent owner UIRF and Ovamed (original license) shall be included to the final license agreement as attachments, to which the terms and conditions of the final license agreement between the company and Ovamed shall not stand in contradiction to or bind Ovamed to any obligations exceeding the rights given by thee terms of the original license.

17.  This Term Sheet will expire on September 26, 2005 unless executed by both parties hereto.

If the foregoing is acceptable to you, kindly so indicate by executing the counterpart in the space provided and returning a copy to us.

PARAMOUNT BIOSCIENCES, LLC

By: _____
in agreement with the foregoing terms         Lindsay A. Rosenwald, M.D.
except the figures in Paragraph 5.            Managing Member

OVAMED, INC.

By: _____
Name: Detlev Goj
Title: Chief Executive Officer
Date: September 26, 2005