## LICENSE AGREEMENT

This Exclusive License Agreement is made and entered into on December 8, 2005 (the "Effective Date") by and between the University of Iowa Research Foundation (hereinafter "UIRF") having offices at 214 Technology Innovation Center, Iowa City, Iowa 52242-5000 and OvaMed GmbH (hereinafter "LICENSEE"), having offices at Kiebitzhoern 33-35, 22885 Barsbuettel Germany.

WHEREAS, under the patent policy of The University of Iowa (UI), all inventions and technology arising during the normal course of research and teaching at the UI are assigned and entrusted to the UIRF to obtain patent or other appropriate intellectual property protection and license said technology;

WHEREAS, UIRF is, therefore, owner by assignment from Joel Weinstock and David Elliott (inventors) of their entire right, title and interest in in United States Patent 6,764,838 and United States Patent Application Numbers 09/362,598; 10/715,659; 10/779,249; Canada Patent Application Number 2,315,790; Japanese Patent Application Number 2000-526233; Australia Patent Number 740776, all titled "Use of Parasitic Biological Agents for Prevention and Control of Autoimmune Diseases", (UIRF 97084 & 99055);

WHEREAS, LICENSEE wishes to obtain an exclusive license in order to practice the PATENT RIGHTS in the United States, Canada, Japan, and Australia to make, have made, use, have used, lease, offer to sell, sell and/or have sold the products made in accordance therewith;

WHEREAS, UIRF wishes to grant to LICENSEE an exclusive license to practice the PATENT RIGHTS in the FIELD in the TERRITORY in accordance with the terms of this Agreement;

WHEREAS, LICENSEE, under the rights granted to it by UIRF hereunder, wishes to grant to Collingwood Pharmaceuticals ("Collingwood ' ). Inc. (a ' 'SUBLICENSEE' ') the exclusive right to to practice the PATENT RIGHTS in the FIELD under a separate agreement;

WHEREAS, LICENSEE and SUBLICENSEE desire to enter into a separate agreement pertaining to the manufacturing and supply of LICENSED PRODUCTs for both commercial and clinical purposes.

NOW THEREFORE, in consideration of the foregoing premises, the parties agree as follows:

### ARTICLE I -- DEFINITIONS

1.1 PATENT RIGHTS shall mean (a) United States Patent Number 6,764,838 and United States Patent Application Numbers 09/362,598; 10/715,659; 10/779,249; Canada Patent Application Number 2,315,790; and Australia Patent Application Number 2000-526233; and Australia Patent Number 740776, all titled "Use of Parasitic Biological Agents for Prevention and Control of Autoimmune Diseases", patents issuing thereon or reissues thereof; any and all foreign patents and patent applications corresponding thereto; any divisional, continuation in part, continuation and reexamination applications; and any extensions thereof; (b) any and all US or foreign patents, patent applications, or other rights issuing from, or filed subsequent to the date of this Agreement, based on or claiming priority to or from the applications and rights listed in 1.1(a); and (c)any foreign counterpart to any of (a or b) not otherwise listed therein. All such PATENT RIGHTS shall be set forth in Appendix A, attached to this Agreement and made part thereof.

1.2 LICENSED PRODUCTS shall mean any product that cannot be manufactured, used or sold, in whole or in part, without infringing one or more claims under PATENT RIGHTS in the country in which the product is made, used, leased, imported, offered for sale or sold.

1.3  LICENSED PROCESSES shall mean processes which, in the course of being practiced would, in the absence of this Agreement, infringe one or more claims of the PATENT RIGHTS.

1.4  NET SALES shall mean the total gross receipts for sales of LICENSED PRODUCTS by or on behalf of the LICENSEE or any of its AFFILIATEs or SUBLICENSEEs, whether invoiced or not, less only the sum of the following: (a) usual trade discounts to customers; (b) sales, tariff duties or use taxes directly imposed and with reference to particular sales; (c) outbound transportation prepaid or allowed and transportation insurance; (d) amounts allowed or credited on returns; (e) bad debt deductions actually written off during the accounting period; (f) sales commissions; and (g) packaging and freight charges.

> 1.4.1  Notwithstanding anything to the contrary in this Article 1.4, NET SALES does not include sales of LICENSED PRODUCT at or below the fully burdened cost of manufacturing solely for non-profit research or clinical testing or for indigent or similar public support or compassionate use programs. If (i) the end user is a SUBLICENSEE or an AFFILIATE or (ii) if LICENSED PRODUCT or LICENSED PROCESS is sold for consideration other than money, then NET SALES shall be calculated based on the final gross selling price of comparable LICENSED PRODUCTs sold in arm's length transactions by LICENSEE to an end user.

> 1.4.2  For purposes of determining NET SALES, LICENSED PRODUCT shall be deemed to be sold when shipped or to be the subject of a sale upon the delivery of LICENSED PRODUCT to the purchaser or a common carrier at the risk of the purchaser and the transfer of title thereto to the purchaser.

> 1.4.3  Sales between or among LICENSEE, SUBLICENSEE and their AFFILIATES shall be excluded from the computation of NET SALES provided such parties are not the end-user of the products, but sales by such entities to their non-affiliated customers shall be included in such computation.

1.5  AFFILIATES shall mean any company, corporation, or business in which LICENSEE owns or controls at least fifty percent (50%) of the voting stock.

1.6  FIELD shall mean the prevention, treatment, cure or diagnosis of human diseases, with the exception of gastroenterology (e.g. inflammatory bowel disease) and hepatology diseases in Europe.

1.7  NON-ROYALTY SUBLICENSE INCOME ("NRSI") shall mean any and all consideration received from a sublicensee of Collingwood inconsideration for grant of a sublicense under the PATENT RIGHTS, which shall include upfront and milestone payments, but expressly excludes all royalty payments; payments resulting from the sale of one or more LICENSED PRODUCTs; research and development funding; equity exchanges and investment.

1.8  SUBLICENSEE means Collingwood or any other third party that has entered into a sublicense agreement with LICENSEE or Collingwood to make, have made, use, have used, lease, offer to sell, sell and/or have sold Collingwood and to practice and have practiced the LICENSED PROCESSES.

1.9  KNOW-HOW means all tangible or intangible information (other than those contained in the PATENT RIGHTS) whether patentable or not (but which have not been patented) and physical objects related to the LICENSED PRODUCT, including but not limited to formulations, biological samples, tissues, animals, organisms, compounds, intermediates, in vitro, preclinical or clinical design, other proprietary materials, processes, including but not limited to manufacturing processes, data, drawings and sketches, and designs owned or controlled by UIRF or which UIRF has the right to disclose and license to LICENSEE, SUBLICENSEE or AFFILIATE.

2.0  TERRITORY shall mean the World, to the extent UIRF has PATENT RIGHTS in specific countries and/or territories in the World.

## ARTICLE II — GRANT

2.1  UIRF hereby grants to LICENSEE and LICENSEE accepts, subject to the terms and conditions hereof, a license in the FIELD to practice  the PATENT RIGHTS in the TERRITORY and to utilize the KNOW-HOW to make, have made, use, have used, lease, import to countries other than the United States, offer to sell, sell and/or have sold the LICENSED PRODUCTS, and to practice and have practiced the LICENSED PROCESSES, to the full end of the term for which the PATENT RIGHTS are granted, unless sooner terminated as hereinafter provided.  Such license shall include the right to grant a sublicense, including to Collingwood.  UIRF further acknowledges and agrees that Collingwood will have the right to further grant sublicenses in its sole discretion.  In order to provide LICENSEE with a period of exclusivity, UIRF agrees it will not grant licenses under PATENT RIGHTS in the FIELD to others except as required by UIRF's obligations in paragraph 2.3 (a) or as permitted in paragraph 2.3(b).

2.2  The term of this agreement and the exclusive license set forth in Paragraph 2.1 shall be from the Effective Date of this Agreement until the expiration of the last to expire of the PATENT RIGHTS.

2.3  The granting and acceptance of this license is subject to the following conditions:

(a)    The UI Patent Policy approved in 1983, Public Law 96-517, Public Law 98-620 and UIRF's obligations under agreements with other sponsors of research.  Any right granted in this Agreement greater than that permitted under Public Law 96-517 or Public Law 98-620 shall be subject to modification as may be required to conform to the provision of that statute.

(b)    UIRF reserves for itself, Inventors, and future not-for-profit employers of Inventors, the right to make and to use for educational, research, and patient care and treatment purposes only, the subject matter described and claimed in PATENT RIGHTS ("Reserved Activity").  UIRF further reserves the right to provide and to grant non-exclusive licenses to make and use physical objects related to the LICENSED PRODUCT, including but not limited to formulations, biological samples, tissues, animals, organisms, compounds, intermediates, and subject matter covered by PATENT RIGHTS to not for profit organizations and government entities for internal research and scholarly purposes only, where such Reserved Activity does not generate a profit for UIRF, the Inventors and future not-for-profit employers of Inventors.

(c)    LICENSEE shall pay, during the term of this Agreement, all future costs connected with the commercial development of the LICENSED  PRODUCTS, including but not limited to the costs of complying with applicable governmental testing, approvals and regulations.

(d)    Subject to Sections 2.4(e) and 4.1, LICENSEE shall use reasonable efforts to effect introduction of the LICENSED PRODUCTS into the commercial market as soon as practicable, consistent with sound and reasonable business practices and judgment; thereafter, until the expiration of this Agreement, LICENSEE shall endeavor to keep LICENSED PRODUCTS reasonably available to the public.

(e)    UIRF shall have the right to terminate or render this license non-exclusive at any time after four (4) years from the date of license if, in UIRF's reasonable judgment, LICENSEE has failed to achieve one or more of the following milestones (each an "Article 2.3 Milestone"): (i) initiation of Phase I within four (4) years from the Effective Date (i) the completion of a Phase II clinical trial using a LICENSED PRODUCT within six (6) years of the Effective Date; (ii) the completion of a Phase III clinical trial using a LICENSED PRODUCT within eleven

and a half (11.5) years of the Effective Date; (iii) the acceptance for review by the FDA of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored New Drug Application ("NDA' ') for a LICENSED PRODUCT within thirteen (13) years of the Effective Date; and (iv) the first commercial sale of a LICENSED PRODUCT by LICENSEE, SUBLICENSEE or AFFILIATE within fourteen and a half (14.5) years of the Effective Date.

Should LICENSEE, SUBLICENSEE and any AFFILIATE fail to achieve any Article 2.4 Milestone, then LICENSEE shall, within thirty (30) days after the applicable milestone date, provide UIRF with a written explanation for such delay and updated "Development Plan' '. UIRF shall, in good faith, consider the explanation of LICENSEE for such delay, and if UIRF finds LICENSEE's explanation and updated "Development Plan'' reasonable, UIRF shall grant, in writing, LICENSEE additional time to achieve the applicable Article 2.4 Milestone, such amount of time to reasonably take into consideration LICENSEE's recommendations and the circumstances of each such delay. Should the LICENSEE's explanation of such delay include the written requirement by the FDA or other applicable regulatory agency that LICENSEE perform additional studies or trials, that LICENSEE reformulate or alter the manufacturing process of any Licensed Product, that LICENSEE cease any clinical trial or redesign any clinical trial, or that LICENSEE perform any other action or cease to perform any action or otherwise delay the clinical development of any Licensed Product, then such evidence presented, in addition to mutually agreed upon "Development plan'' to UIRF by LICENSEE in accordance with this paragraph shall be deemed "reasonable'' by UIRF and UIRF shall grant LICENSEE reasonable time extensions or milestone adjustments accordingly. Should LICENSEE again experience commercial delay, the process described above shall be repeated.

(f)     Any sublicense granted by LICENSEE hereunder shall include a requirement that the SUBLICENSEE use its commercially reasonable efforts to bring the subject matter of the sublicenses into commercial use as quickly as is reasonably possible and shall bind the SUBLICENSEE to meet LICENSEE's obligations to UIRF under this Agreement and a copy of this Agreement shall be attached to such sublicense agreement. Royalties charged for sublicenses by LICENSEE shall not be in excess of normal trade practice. Copies of all sublicense agreements shall be provided to UIRF.

2.4  UIRF hereby grants to LICENSEE the right to extend the licenses granted or to be granted in paragraphs 2.1 and 2.3 to an AFFILIATE subject to the terms and conditions hereof.

2.5  All rights reserved to the United States Government and others under Public Law 96-517 and 98-620 shall remain and shall in no way be affected by this Agreement.

### ARTICLE III — ROYALTIES, PAYMENTS

3.1  LICENSEE shall pay to UIRF a non-refundable license fee in the sum of $100,000 within ninety (90) days after pre-IND meeting at the United States Food and Drug Administration, tentatively scheduled to occur on December 13, 2005 (the "pre-IND Meeting"   ).

3.2  LICENSEE shall reimburse UIRF for patent costs incurred to date, where such costs as of 7/20/05 are One Hundred Ninety Thousand Six Hundred Thirty Three Dollars and Ninety Three Cents ($190,633.93) plus any costs incurred by UIRF in any TERRITORY country between 7/20/05 and the effective date of this agreement and 100% of future Costs incurred in any TERRITORY country for patents covering a LICENSED PRODUCT within ninety (90) days after the pre-IND Meeting.

3.3 LICENSEE shall pay to UIRF the following milestones, such payment may be payable by a SUBLICENSEE or AFFILIATE as a result of a separate agreement or arrangement between LICENSEE and SUBLICENSEE or an AFFILIATE:

3.3.1 Two Hundred Thousand Dollars ($200,000) upon completion by Collingwood of the issuance of Collingwood debt or equity securities to qualified investors in exchange for aggregate cash proceeds equal to or in excess of Five Million Dollars ($5,000,000);

3.3.2 Six Hundred Thousand Dollars ($600,000) upon the acceptance for review by the United States Food and Drug Administration ("FDA") of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored New Drug Application ("NDA") for a LICENSED PRODUCT;

3.3.3 One Million Seven Hundred Fifty Thousand Dollars ($1,750,000) upon the final approval by the FDA of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored NDA for a LICENSED PRODUCT;

3.3.4 One Million Two Hundred Fifty Thousand Dollars ($1,250,000) upon the final approval by the FDA of each subsequent LICENSEE, SUBLICENSEE or AFFILIATE sponsored NDA for a LICENSED PRODUCT having an indication other than the indication on which the milestone of 3.3.3 is based;

3.3.5 Two Hundred Thousand Dollars ($200,000) upon the acceptance for review of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in the European Union by the European Agency for Evaluation of Medicinal Products (the "EMEA") or its successor organization;

3.3.6 Four Hundred Thousand Dollars ($400,000) upon the final approval by the EMEA or its equivalent of the first application for the commercial sale of a LICENSED PRODUCT in the European Union;

3.3.7 Four Hundred Thousand Dollars ($400,000) upon the final approval by the EMEA or its equivalent for each subsequent LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT having a different indication;

3.3.8 Two Hundred Thousand Dollars ($200,000) upon the acceptance for review of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Japan by the Ministry of Health, Labor, and Welfare or its equivalent;

3.3.9 Four Hundred Thousand Dollars ($400,000) upon the approval of a LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Japan by the Ministry of Health, Labor, and Welfare or its equivalent;

3.3.10 Four Hundred Thousand Dollars ($400,000) upon the approval of each subsequent LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Japan by the Ministry of Health, Labor, and Welfare or its equivalent having an indication other than the indication on which the milestone of 3.3.9 is based;

3.3.11 Two Hundred Thousand Dollars ($200,000) upon the acceptance for review of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Canada by Health Canada or its equivalent;

3.3.12 Four Hundred Thousand Dollars ($400,000) upon the approval of a LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT by Health Canada or its equivalent;

3.3.13 Three Hundred Fifty Thousand Dollars ($350,000) upon the approval of each subsequent LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Canada by Health Canada or its equivalent having an indication other than the indication on which the milestone of 3.3.12 is based;

3.3.14    One Hundred Fifty Thousand Dollars ($150,000) upon acceptance for review of the first LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Australia by the Pharmaceutical Benefits Advisory Committee;

3.3.15    Three Hundred Fifty Thousand Dollars ($350,000) upon approval of a LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Australia by the Pharmaceutical Benefits Advisory Committee or its equivalent; and

3.3.16    Three Hundred Fifty Thousand Dollars ($350,000) upon approval of each subsequent LICENSEE, SUBLICENSEE or AFFILIATE sponsored application for the commercial sale of a LICENSED PRODUCT in Australia by the Pharmaceutical Benefits Advisory Committee or its equivalent having an indication other than the indication on which the milestone of 3.3.15 is based.

3.4  (a) LICENSEE shall pay UIRF within thirty (30) days after the end of each calendar quarter, during the term of the license of paragraph 2.1, a royalty of four percent (4%) of the NET SALES. In the case of sublicenses by Collingwood, LICENSEE shall also pay to UIRF thirty percent (30%) of any NRSI received by the Collingwood as a result of the sublicensing of any PATENT RIGHTS prior to the pre IND meeting in the United States or a foreign equivalent; twenty (20%) of NRSI subsequent to the pre-IND but prior to commencement of clinical trials; fifteen (15%) of NRSI after commencement of clinical trials, but prior to the completion of enrollment of a phase II clinical trial; and ten (10%) of any NRSI subsequent to enrollment of Phase II clinical trials.  Notwithstanding anything to the contrary herein, UIRF acknowledges and agrees that any amounts paid to LICENSEE by Collingwood or any of its AFFILIATES pursuant to the entry of Collingwood or its Affiliates into a sublicense agreement with LICENSEE shall be expressly excluded from any cacolcation of NRSI hereunder.  Specifically, UIRF acknowledges and agrees that the following milestone payments to be paid by Collingwood or its AFFILIATES to LICENSEE under a separate sublicense agreement shall be expressly excluded:  (1) One Million Five Hundred Thousand Dollars ($1,500,000) upon acceptance by the FDA of a Collingwood, AFFILIATE-, or Sublicensee-sponsored IND for a LICENSED PRODUCT; and (2) One Million Five Hundred Thousand Dollars ($1,500,000) upon the one year anniversary of the acceptance by the FDA of a Collingwood, AFFILIATE-, or Sublicensee- sponsored IND for a LICENSED PRODUCT.

3.5  In any transfers of LICENSED PRODUCT between LICENSEE and its AFFILIATE or SUBLICENSEE, NET SALES are calculated based on the final sale of the LICENSED PRODUCT to an independent third party end user.

3.6    No multiple royalties shall be payable because the use, lease or sale of any LICENSED PRODUCT or LICENSED PROCESS is, or shall be, covered by more than one valid and unexpired claim contained in the PATENT RIGHTS.

3.7    In the event that a LICENSED PRODUCT is sold in the form of a combination product/process containing one or more products or technologies which are themselves not a LICENSED PRODUCT, the NET SALES for such combination product/process shall be calculated by multiplying the sales price of such combination product by the fraction A/(A+B) where A is the invoice price of the LICENSED PRODUCT or the Fair Market Value of the LICENSED PRODUCT if sold to an AFFILIATE and B is the total invoice price of the other products or technologies or the Fair Market Value of the other products or technologies if purchased from an AFFILIATE.

3.8    Royalty payments shall be paid in United States dollars at such place as UIRF may reasonably designate consistent with the laws and regulations controlling in the United States and if applicable in any foreign country.  Any taxes which LICENSEE, an AFFILIATE or SUBLICENSEE shall be required by law to withhold on remittance of the royalty payments shall be deducted from such royalty payment to UIRF.  LICENSEE shall furnish UIRF with the original copies of all official receipts for such taxes.  If any currency conversion shall be required in connection with the payment of royalties hereunder, such conversion shall be made by using the exchange rate prevailing at Citibank, N.A. in New York, New York on the last business day of the calendar quarterly reporting period to which such royalty payments relate.

3.9     Commencing on the fourth anniversary of the execution date of this Agreement, LICENSEE shall remit to UIRF an annual license maintenance fee payment of Two Hundred Fifty Thousand Dollars ($250,000). Notwithstanding the limitations of this Article 3, annual license maintenance fees paid hereunder shall be reduced by the total amount of any milestones and royalties accrued to LICENSEE, an AFFILIATE or SUBLICENSE solely during the relevant agreement year but shall not be reduced by (a) any royalties accruing in any other agreement year or (b) contract research funding payable to the University of Iowa or UIRF pursuant to the terms of any research or development agreement.

3.10    No payment obligations shall be due with respect to any sale of any LICENSED PRODUCT in a country if there are no issued PATENT RIGHTS underlying such LICENSED PRODUCT in such country.

3.11    To the extent that LICENSEE, an AFFILIATE or SUBLICENSE is required (i) in its sole discretion after appropriate legal analysis, or (ii) by order or judgment of any court in any jurisdiction, to obtain a license from a third party in order to practice the rights purported to be granted to the LICENSEE by UIRF hereunder under PATENT RIGHTS in such jurisdiction, then up to fifty percent (50%) of the royalties payable under such license in such jurisdiction may be deducted from royalties otherwise payable to UIRF hereunder, provided that in no event shall the aggregate royalties payable to UIRF in any semi-annual period in such jurisdiction be reduced by more than fifty percent (50%) as a result of any such deduction, provided further that any excess deduction remaining as a result of such limitation may be carried forward to subsequent periods.

## ARTICLE IV – REPORTING

4.1  Subject to Section 2.4(e), and prior to signing this Agreement, or within sixty (60) days thereafter, LICENSEE shall provide to UIRF a written research and development plan under which LICENSEE intends to bring the subject matter of the licenses granted hereunder into commercial use upon execution of this Agreement ("Development Plan"). Such plan shall include a timeline for conducting regulatory approvals in the licensed Territories.  LICENSEE shall provide written annual reports within sixty (60) days after June 30 of each calendar year which shall include but not be limited to: reports of progress on research and development, regulatory approvals, manufacturing, sublicensing, marketing and sales during the preceding twelve (12) months as well as plans for the coming year.  All reports provided under this Agreement shall be treated as Confidential Information in accordance with Article V of this Agreement.

4.2  LICENSEE shall report to UIRF the date of first sale of LICENSED PRODUCTS (or results of LICENSED PROCESSES) in each country within thirty (30) days of occurrence.

4.4(a)  LICENSEE agrees to submit to UIRF within thirty (30) days after the calendar quarters ending March 31, June 30, September 30, and December 31, reports setting forth for the preceding three (3) month period at least the following information:
   i)      the number of the LICENSED PRODUCTS sold by LICENSEE, its AFFILIATES and SUBLICENSEE in each country
   ii)     total billings for such LICENSED PRODUCTS;
   iii)    an accounting for all LICENSED PROCESSES used or sold;
   iv)     deductions applicable to determine the NET SALES thereof;
   v)      the amount of royalty due thereon;

and with each such royalty report to pay the amount of royalty due.  Such report shall be certified as correct by an officer of LICENSEE and shall include a detailed listing of all deductions from royalties as specified herein.  If no royalties are due to UIRF for any reporting period, the written report shall so state.

All such reports shall be maintained in confidence by UIRF and treated as Confidential Information under Article V of this Agreement, except as required by law, including Public Law 96-517 and 98-620.

(c) Late payments shall be subject to an interest charge of one half percent (0.5%) per month.

## ARTICLE V -- RECORD KEEPING AND CONFIDENTIALITY

5.1    LICENSEE shall keep, and shall require its AFFILIATES and SUBLICENSEES to keep, accurate and correct records of LICENSED PRODUCTS made, used or sold under this Agreement, appropriate to determine the amount of royalties due hereunder to UIRF. Such records shall be retained for at least three (3) years following a given reporting period. They shall be available during normal business hours for inspection at the expense of UIRF by UIRF's Internal Audit Department or by a Certified Public Accountant selected by UIRF and approved by LICENSEE for the sole purpose of verifying reports and payments hereunder. Such accountant shall not disclose to UIRF any information other than information relating to accuracy of reports and payments made under this Agreement. In the event that any such inspection shows an underreporting and underpayment in excess of five percent (5%) for any twelve (12) month period, then LICENSEE shall pay the cost of such examination as well as any additional sum that would have been payable to UIRF had the LICENSEE reported correctly, plus interest.

5.2    Any proprietary or confidential information relating to the Agreement or the business of LICENSEE or SUBLICENSEE collectively constitute the "Confidential Information." The parties hereby acknowledge that the Confidential Information may include material non-public information relating to either the business of LICENSEE or SUBLICENSEE. UIRF and LICENSEE agree that they will not use the Confidential Information for any purpose unrelated to this Agreement and will hold it in confidence during the term of this Agreement and for a period of five (5) years after the termination or expiration date of this Agreement. Except as provided in this Agreement, UIRF and LICENSEE shall not disclose Confidential Information or permit its disclosure to any third party (except to those of its employees, consultants, or agents who are bound by the same obligation of confidentiality as the receiving party is bound by pursuant to this Agreement). However, such undertaking of confidentiality shall not apply to any information or data which:

5.2.1    Is received at any time from a third-party lawfully in possession of same and having the right to disclose same. ·

5.2.2    Is, as of the date of this Agreement, in the public domain, or subsequently enters the public domain through no fault of the receiving party.

5.2.3    Is independently developed by the receiving party as demonstrated by written evidence without reference to information disclosed to the receiving party.

5.2.4    Is disclosed pursuant to the prior written approval of the disclosing party.

5.2.5    Is required to be disclosed pursuant to law or legal process (including, without limitation, to a governmental authority) provided, in the case of disclosure pursuant to legal process, reasonable notice of the impending disclosure is provided to the disclosing party and the disclosing party has agreed to such disclosure in writing or has exhausted its right to contest such disclosure.

## ARTICLE VI -- FILING, PROSECUTION AND MAINTENANCE OF PATENTS

6.1 Pursuant to Article 3.1, LICENSEE shall reimburse UIRF for all reasonable expenses UIRF has incurred for the preparation, filing, prosecution and maintenance of PATENT RIGHTS and shall reimburse UIRF for all such future expenses upon receipt of invoices from UIRF. UIRF shall take responsibility for the preparation, filing, prosecution and maintenance of any and all patent applications and patents included in PATENT RIGHTS.

6.2 UIRF and Licensee shall cooperate fully in the preparation, filing, prosecution and maintenance of PATENT RIGHTS and of all patents and patent applications licensed to Licensee hereunder, executing all papers and instruments or requiring members of UIRF to execute such papers and instruments as to enable UIRF to apply for, to prosecute and to maintain patent applications and patents in UIRF's name in any country. Each party shall provide to the other prompt notice as to all matters which come to its attention and which may affect the preparation, filing, prosecution or maintenance of any such patent applications or patents.

6.3    If Licensee elects to no longer pay the expenses of a patent application or patent included with PATENT RIGHTS, Licensee shall notify UIRF not less than sixty (60) days prior to such action and shall thereby surrender its rights and extinguish its obligations under such patent or patent application.

6.4    Notwithstanding anything to the contrary herein, UIRF shall provide LICENSEE with ample time in which to review and comment on any communication for which submission to any patent office is intended, including but not limited to responses to official actions, amendments, affidavits, declarations and patent applications. In no event shall UIRF provide LICENSEE with less than ten (10) business days in which to review an intended patent office submission prior to such submission. UIRF shall use best efforts to accommodate LICENSEE's requests to (a) enter and/or amend a claim in a pending patent application under the PATENT RIGHTS or (b) file additional patent applications as reasonably needed to advance the purposes of this Agreement or to protect the rights and licenses granted hereunder. UIRF further agrees to retain patent counsel to prosecute and maintain the PATENT RIGHTS that is reasonably acceptable to LICENSEE with respect to quality of work and responsiveness. Within thirty (30) days of the Effective Date of this Agreement, UIRF and LICENSEE shall develop, in good faith, a budget for controlling all costs associated with the preparation, filing, prsosectution and maintainence of the PATENT RIGHTS. UIRF shall obtain LICENSEE's prior written consent for any such costs that exceed the budget by more than ten percent (10%).

6.5    Notwithstanding anything to the contrary herein, UIRF shall authorize UIRF's patent counsel to communicate directly with LICENSEE on the same basis that said patent counsel communicates with UIRF with respect to the prosecution of PATENT RIGHTS.

## ARTICLE VII – MARKING

7.1 If a licensed patent has been or is subsequently issued to UIRF covering any feature or features of the LICENSED PRODUCTS, LICENSEE agrees to mark each and every package or container in which the LICENSED PRODUCTS are used or sold by or for LICENSEE with marking complying with the provisions of Title 35, U.S. Code, Section 287, if required, or any future equivalent provisions of the United States relating to the marking of patented devices, or with marking complying with the law of the country where the LICENSED PRODUCTS are shipped, used or sold.

## ARTICLE VIII – INFRINGEMENT

8.1    The Parties shall promptly provide written notice to each other of any alleged infringement or any challenge or threatened challenge to the validity, enforceability or priority of any of the PATENT RIGHTS, and provide each other with any available evidence of such infringement, challenge or threatened challenge by a third party of the PATENT RIGHTS and provide such other party with any available evidence of such infringement.

8.2    During the term of this Agreement, the LICENSEE shall have the right, but not the obligation, to institute such action as it deems appropriate at its own expense and utilizing counsel of its choice, to terminate the infringement of, and/or challenge to, the PATENT RIGHTS in the TERRITORY in the FIELD through negotiation, litigation and/or alternative dispute resolution means, provided that LICENSEE shall not act in any arbitrary or capricious manner and shall not act in contravention or breach of the licenses granted to LICENSEE hereunder. UIRF shall reasonably cooperate in any such action. In furtherance of such right, UIRF hereby agrees that the UIRF may join LICENSEE as a

party in any such suit (and will join at the LICENSEE's request), provided that the LICENSEE pay all of UIRF's reasonable out-of-pocket expenses. LICENSEE shall indemnify and hold UIRF harmless against any costs, expenses or liability that may be found or assessed against UIRF in any such suit other than resulting from UIRF's negligence or willful misconduct. Any recovery of damages pursuant to this Article 8.2 shall be retained entirely by the LICENSEE and allocated pursuant to 8.4 below.

8.3    In the event that a claim or suit is asserted or brought against the LICENSEE alleging that the manufacture or sale of any LICENSED PRODUCT or LICENSED PROCESS by the LICENSEE, an AFFILIATE, or SUBLICENSEE, or the use of such LICENSED PRODUCT or LICENSED PROCESS by any customer of any of the foregoing, infringes proprietary rights of a third party, the LICENSEE shall give written notice thereof to UIRF. The LICENSEE may, in its sole discretion, modify such LICENSED PRODUCT or such LICENSED PROCESS to avoid such infringement and/or may settle on terms that it deems advisable in its sole discretion, subject to paragraph 8.2. Otherwise, the LICENSEE shall have the right, but not the obligation, to defend any such claim or suit. In the event the LICENSEE elects not to defend such suit, UIRF shall have the right, but not the obligation to do so at its sole expense.

8.4    Any recovery of damages by the LICENSEE, in any such suit under Article 8.3, shall be applied first in satisfaction of any unreimbursed expenses and legal fees of the LICENSEE relating to the suit. The balance remaining from such suit shall be allocated accordingly:  (a) amounts relating to lost sales shall be allocated in their entirety to LICENSEE, provided however, that LICENSEE shall pay UIRF royalties due for such lost sales pursuant to Article III of this Agreement; and (b) amounts relating to punitive damages shall be divided equally between UIRF and LICENSEE.

8.5    The LICENSEE may credit the cost of any litigation costs incurred by the LICENSEE in any country in the TERRITORY pursuant to this Article 8 including all amounts paid in judgment or settlement of litigation within the scope of this Article 8 against royalties or other fees thereafter payable to UIRFs hereunder for such country. If the costs of such litigation in such country exceeds the royalties payable to UIRFs in any year in which such costs are incurred then the amount of such costs, expenses and amounts paid in judgment or settlement, in excess of the royalties payable shall be carried over and credited against royalty payments in future years for such country.

8.6    If within six (6) months after receiving notice of any alleged infringement of the PATENT RIGHTS, the LICENSEE shall have been unsuccessful in persuading the alleged infringer to desist, or shall not have brought and shall not be diligently prosecuting an infringement action, or if the LICENSEE shall notify UIRF, at any time prior thereto, of its intention not to bring suit against the alleged infringer, then, and in those events only, UIRF shall have the right, but not the obligation, to prosecute, at its own expense and utilizing counsel of its choice, any infringement of the PATENT RIGHTS, and the LICENSEE may, for such purposes, join UIRF as a party plaintiff. The total cost of any such infringement action commenced solely by UIRF shall be borne by UIRF and UIRF shall keep any recovery or damages for infringement or otherwise derived therefrom and such shall not be applicable to any royalty obligation of the LICENSEE.

8.7    In any suit to enforce and/or defend the PATENT RIGHTS pursuant to this Agreement, the party not in control of such suit shall, at the request and expense of the controlling party, cooperate in all respects and, to the extent possible, have its employees testify when requested and make available relevant records, papers, information, samples, specimens, and the like.

8.8 If LICENSEE or its SUBLICENSEE elects to commence an action as described above, LICENSEE may reduce, by up to fifty percent (50%), the royalty due to UIRF earned under the patent subject to suit by fifty percent (50%) of the amount of the expenses and costs of such action, including attorney fees. In the event that such fifty percent (50%) of such expenses and costs exceed the amount of royalties withheld by LICENSEE for any calendar year, LICENSEE may to that extent reduce the royalties due to UIRF from Licensee in succeeding calendar years, but never by more than fifty percent (50%) of the royalty due in any one year.

### ARTICLE IX — TERMINATION OF AGREEMENT

9.1  Upon any termination of this Agreement, and except as provided herein to the contrary, all rights and obligations of the Parties hereunder shall cease, except as follows:

    (a)    UIRF's right to receive or recover and LICENSEE's obligation to pay royalties accrued or accruable for payment at the time of any termination;

    (b)    LICENSEE's obligation to maintain records and UIRF's right to conduct a final audit as provided in Article V of this Agreement; and

    (c)    Any cause of action or claim of by either party, accrued or to accrue because of any breach or default by LICENSEE.

9.2  In the event LICENSEE fails to make payments due hereunder which is not subject to a bona fide good faith dispute, UIRF shall provide LICENSEE with ninety (90) days written notice of such failure. LICENSEE shall then have sixty (60) days from the date of such written notice in which to make the payment due.  If payments are not so made within the time limit, UIRF may immediately terminate this Agreement by written notice.

9.3  In the event that LICENSEE shall be in default in the performance of any material obligations under this Agreement (other than as provided in 9.2 above which shall take precedence over any other default), and if the default has not been remedied within ninety (90) days after the date of notice in writing of such default, UIRF may terminate this Agreement immediately by written notice.

9.4  If LICENSEE shall become bankrupt, or shall file a petition in bankruptcy and such petition is not dismissed within sixty (60) days after it has been filed, or if the business of LICENSEE shall be placed in the hands of a receiver, assignee or trustee for the benefit of creditors, whether by the voluntary act of LICENSEE or otherwise, this Agreement shall automatically terminate.

9.5  Any sublicenses granted by LICENSEE under this Agreement shall provide for assignment of this Agreement to SUBLICENSEE upon termination of this Agreement and UIRF shall accept and honor such assignment, provided however, that in the event that this Agreement is terminted due to LICENSEE's breach, SUBLICENSEE shall have at least ninety (90) days in which to bring this Agreement back into good standing.  Should the nature of the activity associated with bringing this Agreement back into good standing reasonably require more than ninety (90) days, then UIRF shall grant SUBLICENSEE additional time in which to bring this Agreement back into good standing.

9.6  LICENSEE shall have the right to terminate this Agreement by giving thirty (30) days advance written notice to UIRF to that effect.  Upon termination, a final report shall be submitted and any royalty payments and unreimbursed patent expenses due to UIRF become immediately payable.

9.7  LICENSEE shall have the right during a period of six (6) months following the effective date of such termination to sell or otherwise dispose of the LICENSED PRODUCT existing at the time of such termination, and shall make a final report and payment of all royalties related thereto within sixty (60) days following the end of such period or the date of the final disposition of such inventory, whichever first occurs.

9.8  Upon termination of this Agreement for any reason, nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination or obligations under Articles 3, 4, 5 and 12, for the exception of obligations under Articles 3.1 and 3.2.  UIRF hereby acknowledges and agrees that, should the LICENSEE terminate this Agreement within 90 days after the pre-IND Meeting, then the LICENSEE shall have no obligation to pay any amounts pursuant to Articles 3.1 and 3.2.  The LICENSEE and/or any SUBLICENSEE thereof may, however, after the effective date of such termination and continuing for a period not to exceed twelve (12) months thereafter, sell all completed LICENSED PRODUCTS, and any LICENSED PRODUCTS in the process of manufacture at the time of such termination, and sell the same, provided that the LICENSEE shall pay or cause to be paid to Licensor the royalties thereon

as required by Articles 3 and 4 of this Agreement and shall submit the reports required by Article 5 hereof on the sales of LICENSED PRODUCTS.

9.9  If not terminated sooner, this Agreement shall terminate on the date of the last to expire valid claim contained in the PATENT RIGHTS in accordance with Section 2.2.

9.10  Force Majeure:  Neither party is responsible for delays resulting from causes beyond its reasonable control, including without limitation fire, explosion, flood, war, strike, or riot, provided that the nonperforming party uses commercially reasonable efforts to avoid or remove those causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever the causes are removed.

## ARTICLE X — ASSIGNMENT

10.1  This Agreement and the rights and duties appertaining hereto may not be assigned by either party without first obtaining the written consent of the other which consent shall not be unreasonably withheld.  Any such purported assignment, without the written consent of the other party, shall be null and of no effect .Notwithstanding the foregoing, the LICENSEE may assign this Agreement without the consent of UIRF (i) to a purchaser, merging or consolidating corporation, or acquiror of substantially all of the LICENSEE's assets or business and/or pursuant to any reorganization qualifying under section 368 of the Internal Revenue Code of 1986 as amended, as may be in effect at such time, or (ii) to an AFFILIATE.

## ARTICLE XI — REPRESENTATIONS AND WARRANTIES:  LIMITATIONS

11.1  Nothing in this agreement shall be construed as:

(a)    A warranty or representation by UIRF as to the validity or scope of any LICENSED PATENT; or

(b)    A warranty or representation that anything made, used or sold under the license granted in this agreement is or will be free from infringement of patents owned by third parties; or

(c)    Conferring a right to use in advertising, publicity or otherwise the name of the UI or UIRF, or the inventors.  Unless required by law, or unless specifically approved in advance in writing by UIRF, LICENSEE's use of t he name "The University of Iowa" or the name of any University of Iowa college, department, or inventor in advertising, publicity or other promotional activities is expressly prohibited.

11.2    Notwithstanding anything to the contrary in this Article 11, UIRF represents that

11.2.1 To the best of its knowledge, subject to the rights of the Federal Government, UIRF has all right, title, and interest in and to the PATENT RIGHTS, including the exclusive, absolute, irrevocable right, title and interest thereto, free and clear of all liens, charges, encumbrances or other restrictions or limitations of any kind whatsoever.

11.2.2   There is no claim, pending or threatened, of infringement, interference or invalidity regarding any part or all of the PATENT RIGHTS or their use.

11.2.3To the best of its knowledge, there are no inventors of PATENT RIGHTS other than those listed as inventors on Exhibit A.

511.2.4 To the best of its knowledge, UIRF has provided LICENSEE with copies of all documents reflecting support or funding for all or part of the research leading to PATENT RIGHTS and Know-how, and has listed all such funding agencies on Exhibit B.

11.3  UIRF represents that, to the best of its knowledge, anything made, used or sold under this agreement will be free from infringement of patents of third parties.

11.4  UIRF EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED OR EXPRESS WARRANTIES AND MAKES NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PATENT RIGHTS OR INFORMATION SUPPLIED BY UIRF, LICENSED PROCESSES OR LICENSED PRODUCTS CONTEMPLATED BY THIS AGREEMENT.  UIRF assumes no responsibilities whatever with respect to design, development, manufacture, use, sale or other disposition by LICENSEE or AFFILIATES of LICENSED PRODUCTS, or LICENSED PROCESSES.  The entire risk as to the design, development, manufacture, offering for sale, sale, or other disposition and performance of LICENSED PRODUCTS, and LICENSED PROCESSES is assumed by LICENSEE and AFFILIATES.

## ARTICLE XII – GENERAL

12.1  (a)  LICENSEE shall indemnify, defend and hold harmless UIRF and the University of Iowa and their current or former directors, governing board members, trustees, officers, faculty, medical and professional staff, employees, students, and agents and their respective successors, heirs and assigns (the "Indemnities"), against any liability, damage, loss or expenses (including reasonable attorneys' fees and expenses of litigation) incurred by or imposed upon the Indemnities or any one of them in connection with any claims, suits, actions, demands or judgements arising out any theory of product liability (including, but not limited to, actions in the form of tort, warranty, or strict liability) concerning any product, process or service made, used or sold pursuant to any right or license granted under this Agreement.  Notwithstanding the foregoing, LICENSEE shall not indemnify, defend or hold harmless UIRF for liabilities, damages, losses or expenses which are the result of the negligent acts or omissions of the University, its employees, or agents to the extent permitted by Iowa Code Chapter 669.

(b)  LICENSEE agrees, at its own expense, to provide attorneys reasonably acceptable to UIRF to defend against any actions brought or filed against any party indemnified hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

(c)  Beginning at the time as any such product, process or service is being commercially distributed or sold (other than for the purpose of obtaining regulatory approvals) by LICENSEE or by a SUBLICENSEE, AFFILIATE or agent of LICENSEE, LICENSEE shall, at its sole cost and expense procure and maintain comprehensive general liability insurance in amounts not less than $2,000,000 per incident and $2,000,000 annual aggregate and naming the Indemnitees as additional insureds.  During clinical trials of any such product, process or service LICENSEE shall, at its sole cost and expense, procure and maintain comprehensive general liability insurance in such equal or lesser amounts as UIRF shall require, naming the Indemnitees as additional insureds.  Such comprehensive general liability insurance shall provide (i) product liability coverage and (ii) liability coverage consistent with LICENSEE's indemnification obligations under this Agreement.  If LICENSEE elects to self-insure all or part of the limits described above (including deductibles or retentions which are in excess of $250,000 annual aggregate) such self-insurance program must be acceptable to UIRF.  The minimum amounts of insurance coverage required shall not be construed to create a limit of LicenseeLICENSEE's liability with respect to its indemnification under this Agreement.

(d)  Licensee shall provide UIRF with written evidence of such insurance upon request of UIRF.  Licensee shall provide UIRF with written notice at least fifteen (15) days prior to the cancellation, non-renewal or material change in such insurance; if Licensee does not obtain replacement insurance providing comparable coverage within such fifteen (15) day period, UIRF shall have the right to terminate this Agreement effective at the end of such fifteen (15) day period upon written notice.

(e) LICENSEE shall maintain such comprehensive general liability insurance beyond the expiration or termination of this Agreement during (i) the period that any product, process, or service, relating to, or developed pursuant to, this Agreement is being commercially distributed or sold by LICENSEE or by a SUBLICENSEE, AFFILIATE or agent of LICENSEE and (ii) a reasonable period after the period referred to in (e)(i) above which in no event shall be less than six (6) years.

12.2  In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, the parties shall try to settle such conflicts amicably between themselves.  Subject to the limitation stated in the final sentence of this section, any such conflict which the parties are unable to resolve may be settled through arbitration conducted in accordance with the rules of the American Arbitration Association.  In the event a dispute is arbitrated, the demand for arbitration shall be filed within a reasonable time after the controversy or claim has arisen, and in no event after the date upon which institution of legal proceedings based on such controversy or claim would be barred by the applicable statutes of limitation.  Such arbitration shall be held in Des Moines, Iowa.  The award through arbitration shall be final and binding.  Either party may enter any such award in a court having jurisdiction or may make application to such court for judicial acceptance of the award and an order of enforcement, as the case may be. Notwithstanding the foregoing, either party may, without recourse to arbitration, assert against the other party a third-party claim or cross-claim in any action brought by a third party, to which the subject matter of this Agreement may be relevant.

12.2.1 Pending the resolution of any dispute or conclusion of negotiations related to the resolution of any dispute. pursuant to this Article 12, the parties agree that any time-based defenses shall be tolled.

12.2.2 Notwithstanding anything to the contrary, in no event shall the arbitration provisions of this Article 12 be instituted by either party to settle any controversy or claim arsing out of or relating to the scope, construction or validity of the PATENT RIGHTS.

12.3  Should a court of competent jurisdiction later consider any provision of this Agreement to be invalid, illegal, or unenforceable, it shall be considered severed from this Agreement.  All other provisions, rights and obligations shall continue without regard to the severed provision, provided that the remaining provisions of this Agreement are in accordance with the intention of the parties.

12.4  No waiver by a Party of any breach of this Agreement, no matter how long continuing or how often repeated, shall be deemed a waiver of any subsequent breach thereof, nor shall any delay or omission on the part of a Party to exercise any right, power or privilege hereunder be deemed a waiver of such right, power or privilege.

12.5  The relationship between the Parties is that of independent contractor and contractee. LICENSEE shall not be deemed to be an agent of UIRF in connection with the exercise of any rights hereunder, and shall not have any right or authority to assume or create any obligation or responsibility on behalf of UIRF.

12.6  No party hereto shall be deemed to be in default of any provision of this Agreement, or for any failure in performance, resulting from acts or events beyond the reasonable control of such Party, such acts of God, acts of civil or military authority, civil disturbance, war, strikes, fires, power failures, natural catastrophes or other "force majeur" events.

## ARTICLE XIII – NOTICES; APPLICABLE LAW

13.1  Any notice, report or payment provided for in this Agreement shall be deemed sufficiently given if in writing and when sent by express courier, certified or registered mail addressed to the party for whom intended at the address set forth below, or to such address as either party may hereafter designate in writing to the other:

(a) For the UIRF:        University of Iowa Research Foundation, Attn: Executive Director
                         214 Technology Innovation Center, Iowa City, Iowa  52242-5000

(b) For the LICENSEE: Ovamed GmbH
                         Kiebitzhoern 33-35,
                         22885 Barsbuettel
                         GERMANY

13.2  This Agreement shall be construed, interpreted, and applied in accordance with the laws of the State of Iowa.

13.3  LICENSEE agrees to comply with all applicable laws and regulations.  In particular, it is understood and acknowledged that the transfer of certain commodities and technical data is subject to United States laws and regulations controlling the export of such commodities and technical data, including all Export Administration Regulations of the United States Department of Commerce.  These laws and regulations among other things, prohibit or require a license for the export of certain types of technical data to certain specified countries.  LICENSEE hereby agrees and gives written assurance that it will comply with all United States laws and regulations controlling the export of commodities and technical data, that it will be solely responsible for any violation of such by LICENSEE or its AFFILIATES or SUBLICENSEEs, and that it will defend and hold UIRF harmless in the event of any legal action of any nature occasioned by such violation.

ARTICLE XIV — INTEGRATION

14.1  This Agreement constitutes the final and entire agreement between the parties, and supersedes all prior written agreements and any prior or contemporaneous oral understanding regarding the subject matter hereof.  Any representation, promise or condition in connection with such subject matter which is not incorporated in this agreement shall not be binding on either party.  No modification, renewal, extension or termination of this agreement or any of its provisions shall be binding upon the party against whom enforcement of such modification, renewal, extension or termination is sought, unless made in writing and signed on behalf of such party by a duly authorized officer.

IN WITNESS WHEREOF, each of the parties have caused this agreement to be executed by its duly authorized representative.  The effective date of this Agreement is _December 8, 2005_ .
Signed this _8th_ day of _December_ , 2005. Signed this ____ day of _____, 2005.

UIRF                                          LICENSEE
The University of Iowa Research Foundation    Ovamed GmbH

By _Brenda L. Akins_                          By _____
Name: Pamela K. York  Brenda L. Akins         Name: Detlev Goj
Title: Executive Director  Associate Director  Title: C E O

Appendix A

The following comprise PATENT RIGHTS:

United States Patent Number 6,764,838
United States Patent Application Numbers 09/362,598; 10/715,659; 10/779,249
Canada Patent Application Number 2,315,790
Japanese Patent Application Number 2000-526233
Australia Patent Number 740776

## Appendix B

National Institutes of Health/DHHS grant ID's DK38327, DK58755, DK02428, DK25295, and AI49382.