

HÖLTERS & ELSING, FREIHERR-VOM-STEIN-STR. 24-26, D-60323 FRANKFURT

Herrn Rechtsanwalt
Dr. Klaus Lodigkeit
Vorberg Rechtsanwälte
Warburgstraße 37

20354 Hamburg

DR. CHRISTOPH F. WETZLER
RECHTSANWALT

DIRECT LINE   +49 (0) 69 - 71 588-201
TELEFAX       +49 (0) 69 - 71 588-588
EMAIL         wetzler@hoelters-elsing.com

FREIHERR-VOM-STEIN-STR. 24-26
D-60323 FRANKFURT

4022/06
hk/D/D29422

February 6, 2007

**Ovamed/Collingwood**

Dear Colleague Dr. Lodigkeit,

Thank you for your correspondence dated January 2, 2007.

First, we regret that it has taken us so long to respond. However, we cannot hide our disappointment with your letter. We had hoped, based on our earlier teleconference enumerating issues that required resolution, that your letter would summarize and provide evidence concerning the several issues that you raised. We then planned to do the same and looked forward to meeting with you in Europe to chart a path for moving forward.

Unfortunately, your January 2 letter did nothing of the sort. Rather, on the pretext of your stated failure to countersign a Manufacturing & Supply Agreement ("M&S Agreement") fully negotiated among the parties and executed by Collingwood, your letter purports to renegotiate myriad issues expressly addressed in the fully executed and separate Sublicense Agreement and to change entirely the longstanding agreement among the parties. In the first portion of our response below, we summarize these non-negotiable issues regarding which Collingwood is not amenable to convening meetings or otherwise engaging in further discussions.

Hölters & Elsing
RECHTSANWÄLTE

- 2 -

In the hope that your client, on reflection, will appreciate Collingwood's unwillingness to renegotiate the core provisions of the Sublicense Agreement but still wishes to move forward without litigation, the second portion of our response addresses issues you raise regarding compliance with certain terms of the Sublicense Agreement and the M&S Agreement. To the extent you believe that a face-to-face meeting limited to those issues can result in a complete resolution of the issues separating the parties, we would be glad to take that option under consideration.

*Collingwood will not renegotiate the parties' negotiated agreement.*

1.  Manufacturing Exclusivity

Nothing in the Sublicense Agreement (nor in the M&S Agreement) prohibits Collingwood from collaborating with third parties regarding the development of TSO or the manufacture of related products. We documented this conclusion in our earlier correspondence; this point is incontrovertible and non-negotiable.

2.  Diligence Milestones

Our client rejects any request to modify the final economic terms of the Sublicense Agreement, including your proposed insertion of "time limits" for milestones. Article 3 of the Sublicense Agreement describes fully Collingwood's obligations with respect to the development and commercialization of the technology. While the Agreement does not contain, nor will we entertain, artificial timelines, we note that current delays associated with the commencement of the monkey study and advancement of the IND are directly attributable to Ovamed's inability to supply Collingwood with GMP-grade product.

3.  Sublicense to Manufacturing Patents

The negotiated terms of the M&S Agreement (including, specifically, Section 8.2.2) provide that, in the event Ovamed is unable to fill Collingwood's purchase orders for an extended period, Ovamed will grant to Collingwood a license under any intellectual property needed to manufacture licensed products. While this issue is fundamental to the deal among the parties, it should not be of meaningful concern to your client: To the extent that your client is able to properly manufacture product for Collingwood, no manufacturing license to Collingwood would be forthcoming.

Hölters & Elsing
RECHTSANWÄLTE

- 3 -

### 4. Effectiveness of the M&S Agreement

Much of the advocacy in your January 2 letter stems from your client's current position that the M&S Agreement is not effective because it failed to return a countersigned copy to Collingwood. As you must know, your position is undermined by numerous earlier correspondence from your client relying on the provisions of the M&S Agreement and thus confirming the consensus of the parties on its enforceability.

### 5. Patent Costs

Section 4.1.2 of the Sublicense Agreement sets forth the precise amount due by Collingwood to Ovamed for patent costs incurred prior to the date of execution of the Sublicense. Section 6.1 of the Sublicense Agreements makes clear that Collingwood is obligated to reimburse Ovamed only for patent costs incurred in relation to the License Agreement with the University of Iowa (and not with respect to costs incurred under Ovamed's license agreement with Dr. Falk Pharma). Earlier correspondence from the University of Iowa, as well as Collingwood's internal accounting records, clearly establishes that Collingwood has previously paid all amounts due to Ovamed for past patent expenses. Your client's claims to the contrary ring hollow. We again respectfully urge your client to furnish any documentation establishing Collingwood's obligation to reimburse Ovamed for other patent expenses. Indeed, that was precisely the objective of this correspondence process.

### 6. Communications with Iowa

Article 6 and other sections of the Sublicense Agreement clearly establish Collingwood's right to communicate with the University of Iowa regarding the sublicensed patent portfolio. The Sublicense Agreement further obligates Ovamed to instruct Iowa's patent counsel to communicate with Collingwood regarding the portfolio. Such communication is fundamental to the creation of a robust intellectual property portfolio for TSO.

### 7. Communications with Dr. Falk Pharma

While your January 2nd correspondence in paragraph 2 requests the immediate cessation of communications between Collingwood and Dr. Falk Pharma, paragraph 3 of the same letter requests that our client enter into an agreement with Dr. Falk Pharma for the development of TSO. Collingwood has every right to communicate with Dr. Falk Pharma if it sees fit to do so and obviously cannot enter into an agreement with a party with which it cannot communicate.

### 8. Sales or Delivery of TSO in Collingwood Territory

Collingwood is not threatening Ovamed with a criminal investigation. However, Collingwood is referencing the indisputable fact that your client's sale or delivery of TSO into the US, in addition to constituting a breach of the Sublicense Agreement, is violative of US law. Sales of an unapproved biologic in the US violate the Public Health Service Act and the Federal Food, Drug Cosmetic Act. Moreover, such activities may ultimately jeopardize any future biologics license applications submitted in relation to TSO. As a result, it is imperative that your client ceases and desists at once from any further sale of TSO into Collingwood Territory, and Collingwood obviously reserves all of its right to hold Ovamed and its principals liable for any damages occurring by virtue of this unlawful activity.

### 9. Allergic Asthma Clinical Study

Collingwood met with Dr. Frank Kanniess (together with Detlev Goj) for the first time on May 23, 2006. Prior to Collingwood's execution of the Sublicense Agreement, Dr. Kanniess and Mr. Goj apparently agreed to initiate an allergic asthma study through the Pulmonary Research Institute ("PRI"). Collingwood has made no commitment (written or otherwise) to reimburse Ovamed for such expenses. Rather, discussions with Dr. Kanniess centered on the need for a confidentiality agreement and proposed budgets prior to commencement of any study.

### 10. Inventors of TSO

Collingwood previously discussed with the inventors of TSO the terms of an independent consulting agreement pursuant to which the inventors would assist Collingwood in development of TSO. Such discussions, which have not yet resulted in an agreement, are the province of the inventors and Collingwood. They are not related to the agreements between Ovamed and Collingwood and have no place at a discussion among our clients.

*Collingwood remains interested in constructive dialogue aimed at achieving progress in the clinical development program.*

While our client will not travel to Europe or otherwise conduct discussions on core issues agreed upon more than a year ago, our client does wish to find a pathway by which progress can be made on the clinical development and eventual commercialization of TSO. To that effect, we propose for your consideration a revised agenda enumerating legitimate issues whose resolution may facilitate better collaboration between the parties.

1. <u>Ovamed as a Supplier of TSO</u>

While our client is fully entitled to collaborate with third parties in the manufacture of licensed products, Collingwood remains amenable to employing Ovamed as a long-term supplier of TSO. Our client thus remains open to discussions focused on Ovamed's TSO manufacturing process and the terms of a supply contract to Collingwood. Indeed, to the extent that Ovamed is able to satisfactorily address, and ensure compliance with, the regulatory concerns raised by our client, Collingwood would have no objection to entering into a "minimum purchase agreement" as proposed in your correspondence.

2. <u>Manufacturing of TSO</u>

For Ovamed to secure its place as Collingwood's long term supplier, our client would respectfully request further information related to (i) Ovamed's corrective action plan to the issues raised by the EMEA; (ii) the status of Ovamed's TSO manufacturing process development, including without limitation, the status of Lot PT001-05; and (iii) Ovamed's strategy for ensuring production of TSO that is GMP-grade, safe and manufactured in accordance with a reproducible process. Those areas certainly are appropriate for further discussion among the parties.

3. <u>Patent Expenses</u>

As noted, while Collingwood does not believe it owes Ovamed additional past patent expenses, it is willing to discuss in good faith Ovamed's claims to the contrary. Our client thus reiterates its request that Ovamed forward evidence supporting claims that it is owed additional monies.

4. <u>Patent Cooperation</u>

The parties owe each other and Iowa an obligation to protect the intellectual property underlying the TSO assets. Collingwood would look forward to discussing ways of enhancing patent cooperation generally, and national phase entry of patent applications relating to TSO specifically.

5.  Sales of TSO in Collingwood Territory

Ovamed has no right to sell TSO in Collingwood's territory. It certainly cannot do so in violation of US law, thereby endangering the entire program. These are important and serious issues and are properly the subject of discussion among the parties.

6.  Iowa Notice of Breach

We are concerned also by the notices of breach sent to Ovamed by the University of Iowa. That, too, is an important and serious issue that warrants appropriate discussion.

While we agree that litigation hardly advances the economic goals of our clients, our client's economic goals surely will not be advanced by your client's proposal to eviscerate the parties' agreement and turn the agreement upside down. To be sure, we will sooner litigate these issues in a court of appropriate jurisdiction than agree to renegotiate them.

That said, we do wish to put unnecessary bickering behind us and move forward with a constructive plan to advance the development of the asset and the parties' genuine economic goals. Those goals, to our mind, would be furthered by serious dialogue addressed to Ovamed's manufacturing processes and, to the extent those processes are compliant with regulatory requirements, purchase order commitments by Ovamed for clinical and eventually commercial supply. We are hopeful that Ovamed will appreciate the wisdom of such discussions and agree to resume in good faith dialogue focused on those issues.

Yours sincerely,

*[signature: C. F.]*

Christoph F. Wetzler